ATLANTIC MUT. LIFE INS. CO., (HOLABIRD v.) See Case No. 6,587.

ATLANTIC & G. R. CO., (BRANCH v.) See Case No. 1,807.

ATLANTIC & G. R. CO., (CITY OF SAVANNAH v.) See Case No. 12,385.

ATLANTIC & G. R. CO., (JESSUP v.) See Case No. 7,299.

ATLANTIC & G. R. CO., (STATE OF GEORGIA v.) See Case No. 5,351.

---

## Case No. 630.

ATLANTIC & P. GUANO CO. v. The ROBERT CENTER.

[N. Y. Times. Aug 24, 1862.]

District Court, S. D. New York. Aug. 24, 1862.

SHIPPING — CHARTER-PARTY — REFUSAL BY CONSIGNEE TO RECEIVE—DISPOSAL OF CARGO—DAMAGES—DEMURRAGE.

[1. A contractor entered into an agreement with a guano company to charter vessels, and transport guano to market, and to deliver the cargo to consignees of the company which was entitled to the bills of lading, the cargoes to be subject to the payment of freight and charges, and to the payment of eight dollars per ton to the company at first out of the surplus. Held, that the district court had jurisdiction of an action by the guano company on the contract against a ship which had been chartered by the contractor to carry out the enterprise, as it was a general charter party, by which the cargo was to be put on board by a sub-freighter, who was entitled to bills of lading, and was to be consigned to agents of the sub-freighter at the port of destination.]

[2. Where the undertaking was to carry the cargo to Antwerp, and deliver it to the consignee of the guano company, and the master

of the chartered ship, on the refusal of the consignee at Antwerp to accept the cargo, left it in the absolute control of the contractor, instead of either delivering it to some responsible house, who would have received it on the same terms as the consignment, or storing it in Antwerp, subject to the order of the company, the ship was liable for the value of the cargo at Antwerp, after deducting freight and all proper charges, at least up to eight dollars per ton, provided the value should so far exceed the freight and charges.]

[Cited in Fox v. Holt, Case No. 5,012, note.]

[3. The agents of the guano company told the master of the chartered ship that they would guarantee nothing in the way of dispatch, but would deliver as fast as they could, and were about to send one of their ships to the guano islands with more laborers and boats to facilitate the loading. Both ships arrived at the islands at the same time, and the chartered ship was ready to take in cargo, but the ship sent out by the company took some days to get ready, and was loaded first. *Held*, that the chartered ship was entitled to demurrage at the rate specified in the charter party from the time of her arrival until she commenced loading.]

[In admiralty. Libel by the Atlantic & Pacific Guano Company against the ship the Robert Center, and Joseph H. Arnold, master, on charter party. Respondents claim demurrage. Referred to a commissioner.]

SHIPMAN, District Judge. In the winter and spring of 1858 and 1859, the libellants were the owners of guano on Swan island, in the Carribean sea. On the 18th day of December, 1858, they entered into a contract with one Geo. W. Cochran, by the terms of which the latter was to charter vessels, and transport guano to market, the cargoes to be subject to the payment of freight and charges, and out of the surplus the libellants were first to receive eight dollars per ton. The guano was to be delivered to the consignees of the libellants, and the latter were entitled to bills of lading. There were other stipulations in the contract, which it is not necessary to notice in this place, but which may be referred to hereafter, when I come to examine the claim of the respondents to demurrage.

In January, 1859, Cochran, in carrying out the enterprise in which he had engaged with the libellants, chartered the ship Robert Center, of and then lying in the port of New York. The ship was owned by Edw. C. Center, and Arnold, her master, the former owning three fourths, and the latter one fourth. Before the charter of the ship was concluded with Cochran, Capt. Arnold and Mr. Caldwell, the agent of Edw. Center, called at the office of the libellants at New York, for the purpose, as they allege, of ascertaining if the guano would be delivered to the ship under Cochran's charter, and what were the probable facilities of loading the cargo. They there saw the agents of the libellants, Mr. Fahens, the secretary, and Mr. Fowler, the president of the company. In the evidence before the court there

are some sharp contradictions as to what took place in this interview, the great struggle between the parties being whether or not Capt. Arnold at this time knew, or admitted that he knew, what the terms of Cochran's contract with the libellants were. In determining the general question of the liability of the ship, however, I do not think it of great importance whether Capt. Arnold knew the terms of this contract or not, although the balance of the proofs is in favor of the claim that he did. It will be seen in the course of this opinion, that I rest the liability of the ship on other grounds:

1. The first question raised by the respondents is that the court has no jurisdiction. This objection is untenable. It is a plain case of a general charter party,—a well known form of maritime contract; the cargo being put on board by a sub-freighter, who was entitled to the bills of lading, and consigned to the agents of the latter, at the port of destination.

2. The undertaking was to carry the cargo to Antwerp, and there deliver to Marsily, the consignee of the libellants. There is no escape upon the evidence before the court from the conclusion that Capt. Arnold so understood it. He offered to sign bills of lading to this effect, although he refused to sign those tendered him, but his refusal rested wholly on other grounds. The ship proceeded on her voyage with the cargo on board as far as Flushing, within about seventy miles of Antwerp. Here Cochran, who had preceded the ship to Europe, met her, and both he and Capt. Arnold proceeded to Antwerp, leaving the ship at Flushing. They found Marsily, the consignee, and Capt. Arnold tendered him the cargo, or perhaps it would be more proper to say offered to tender it. Marsily refused to receive it. This refusal appears to be relied on, is formally alleged in the answer, and is proved by the evidence. Surely, all this trouble and formality of an offer to Marsily to deliver the cargo to him at Antwerp, would not have been gone through with if Capt. Arnold had not understood that he was bound to the libellants so to deliver it. If he was bound only to Cochran, the latter could have dispensed with any obligation due to him, as well at Flushing as at Antwerp. It was not necessary for Capt. Arnold to travel seventy miles to Antwerp, and make a formal tender to a third person, in order to have received valid directions from Cochran as to the disposition of a cargo which Cochran owned, or which he had the legal right to control. It would be doing injustice to the intelligence of any American ship master to impute to him any such absurd idea. Now it is quite clear that while Capt. Arnold felt it his duty, as it surely was, to offer the cargo to Marsily, the consignee of the libellants, he somehow imbibed the notion (probably through bad advice) that the refusal

of Marsily to receive it left it at the absolute control of Cochran. This was a snare and a delusion. He should, on the refusal of Marsily to receive it, have delivered it to some other proper and responsible house, who would have received it on the same terms as those on which it was consigned to Marsily; or if no such house would receive it on those terms, he should have stored it at Antwerp, subject to the order of the libellants. This was the duty which the maritime law imposes on him,—a duty founded in good sense, and enforced by considerations of convenience and safety to both ship owners and freighters. There is no evidence that Capt. Arnold intended to defraud the owners of this cargo, but it is clear he mistook his duty, and committed an error for which his ship is liable to the extent of the damages, which resulted to the libellants from that error. Now, what were those damages? It is claimed by the libellants that the rule of damages should be the eight dollars per ton which Cochran was in a certain event to pay them for the guano. But in the present state of the case no such rule can be adopted. This would be visiting upon Capt. Arnold and his ship a mere arbitrary penalty for his error, and would in effect make him an insurer of all possible profits, which might have accrued to the libellants out of their enterprise with Cochran. The profits of that enterprise, which were wholly contingent, would, by this error of Capt. Arnold, become wholly certain and absolute. If this rule were to be applied to the case, the libellants might well congratulate themselves that the act of Capt. Arnold, of which they formally and rightfully complain in their libel, had rendered the success of this somewhat dubious enterprise with Cochran complete. It may be that eight dollars per ton is the true rule of damages. That, however, depends upon the fact whether the libellants could have realized the sum from this cargo, over and above freight and charges, had Capt. Arnold done his whole duty, by delivering it at Antwerp. In other words, the damages for which the ship is liable are those, and those only, which the libellants suffered from the failure of Capt. Arnold to deliver the cargo at Antwerp, either to some proper and responsible house, who would receive it on the same terms, under which it was consigned to Marsily, or in store, subject to libellants' order. It may be that these damages amount to $8 per ton. They cannot amount to more unless the contract between the libellants and Cochran is to be deemed as having been rescinded, with notice to Arnold before the time when the delivery at Antwerp should have taken place, of which I see no evidence. They may amount to much less, or to nothing at all. What the fact is of course the court cannot know, until the matter is determined upon a proper reference. It follows from these views, that the ship must be held liable for the value of the cargo at Antwerp, after deducting freight and all proper charges, at least up to $8 per ton, provided the value should so far exceed such freight and charges.

3. This brings us naturally to the only remaining question, viz:—What are the charges proper to be deducted from the value of this cargo at Antwerp, before we begin to estimate the damages to the libellants? And the only difference between the parties here is, that which relates to the single item of demurrage. This item is a large one, amounting to $4,700. In determining this point in the case, I do not deem it necessary to go into the general law of demurrage, as I think the duties and obligations of both the libellants and the respondents must be determined by the contract between the libellants and Cochran, and the representations made by the former to Capt. Arnold, and for this purpose I hold Capt. Arnold must be charged with a knowledge of the contract. Now, the contract says the cargo was to be delivered as fast as the agent of the libellants could deliver it. From this it would appear that they did not intend to bind themselves to a particular number of lay-days within which the cargo should be delivered to the ship, but only bound themselves to use all dispatch with the force they might have at the island where the Robert Center should arrive. In addition to this both Mr. Fowler and Mr. Fahens, on behalf of the libellants, assured Capt. Arnold at their interview with him that they would render every facility in their power to load the ship, although they would give no guaranty as to time. They further stated to him that they were about to dispatch the Golden Lead to the island, with more laborers and boats, to facilitate these operations of loading. Now, taking this clause of the contract and these representations, and no one would imagine from either or all of them taken together that this vessel, the Golden Lead, was to be sent out there to be loaded in advance of the Robert Center, keeping the latter waiting thirty days before she could commence loading at all. The fair import of these representations was that the sending out of the Golden Lead would facilitate the operation of loading the Robert Center, and I think Capt. Arnold had a right to rely on that result. But what was the fact? The Golden Lead was required by the libellants to be loaded first, and the Robert Center was compelled to await thirty days before commencing. This was not facilitating the loading of the latter vessel, but hindering and delaying it. Neither was it in conformity with the spirit of the contract to deliver the guano to the chartered vessels of Cochran as fast as the company could do it. According to the claim of the libellants, they might have sent a dozen ships of their own chartering to the island, and loaded them all first, thus postponing the loading of Cochran's vessels to

their and his ruin. The only risk he was to take in regard to the time of loading was the possible absence of the libellants' men from the island when his vessels should arrive, and the necessary and inevitable delay that might take place while the libellants were doing their best .to load their ships. .To say that the libellants, upon the heel of the execution of this contract, could send out ships of their own to be loaded in advance of those chartered by Cochran, and thus ruinously postpone the loading of his, would be unwarrantable, and ill comport with the just and equitable principle of the maritime law. No ship could have been chartered by Cochran to engage in such an undertaking, subject to such a power in the company. Cochran, in his deposition, says something about the loading of the Golden Lead first, if she should arrive first being spoken of, but I attach as little importance to his statements as the counsel for the libellants does. I think the terms of the contract and the sworn statements of Mr. Fahens and Mr. Fowler, made on this trial, the better evidence on this point. But assuming the version of Cochran the true one, I still think the Robert Center should have been loaded first. It is true Capt. Johnson, of the Golden Lead, says that he arrived a few hours the first, but he also says, they came to the landing together, and that the Robert Center delivered her order and was ready to take in cargo at once, while the Golden Lead was not ready until some days to commence taking in her cargo. I am, therefore, of opinion that the libellants are liable to the ship for demurrage, at the rate specified in the charter party, for every day from the time of her arrival up to the time she commenced loading, and no more. Even if Capt. Arnold did not know of the stipulation in Cochran's contract, that the cargo was to be delivered only so fast as it could be done by the libellants, he was told that they would guarantee nothing in the way of dispatch. but would deliver it as fast as they could. There is no evidence of any remissness on their part after the Golden Lead was loaded, and therefore they cannot be held liable for the delay, which they informed Capt. Arnold they would not be liable for, before he concluded his charter party.

Something is said in the answer about the failure of the libellants to perform that part of the contract with Cochran by which they stipulate to deliver the guano "alongside and within reach of the vessel." If there was any material delay or expense, or either occasioned by any failure of the libellants in this particular, let it be gone into on the reference, and reported to the court by the same commissioner who may inquire into the value of this cargo at Antwerp, at the time when it should have been delivered by Capt. Arnold at that place. Let an order of reference be made to a commissioner in conformity with this opinion.